Good morning, Your Honors. My name is Robert Powell, appearing here on behalf of the plaintiffs, and with me at council table is Robert Gibbs. I would like to reserve five minutes by way of rebuttal, approximately five minutes. I'll keep track of your time. I will do that. I'll try to help if possible, but it's your responsibility. Thank you. Counsel, you're going to start off by a really clear and simple explanation of this scheme, right? I will do my best, Your Honor. In this case, the first point I would like to make is that the complaint alleges, and the allegations have to be accepted as true, that in fiscal year 2008 and 2009, and, in fact, continuing to the present, the statute and the regulations, this statutory and regulatory framework has been violated in a way that has harmed the plaintiffs in this case. I have a couple of problems with that statement. One problem that I have is when I looked at the statute, it looked to me as though Congress set up a general scheme and delegated a great deal of authority to the State Department to figure out exactly what the scheme was going to be. They delegate to the State Department the power to make regulations. The second thing that confuses me is that it does not look to me as though, as Congress conceived of the scheme, it's for the benefit of the people seeking to get into the United States. It looks like the congressional scheme is for the benefit of American employers trying to get suitable employees from abroad. And the third problem that I have with your argument is it looks as though Congress, very specifically, did not want the larger countries or the countries that sent more people, traditionally, to be able to hog all the spots as they would on a simple first-come, first-served basis. When I put those three things together, you can see I have three significant problems. Well, again, first, I think- So if you can help me with them, that's great. I think, first of all, I would point out, again, the district court was assuming, and I think we have to assume that the allegations in the complaint are, as stated, are true, that there are statutory and regulatory violations. Factual allegations. But what you just said, that's incorrect. We don't assume that it's true that there are statutory violations because that's a conclusion of law, and that is not assumed on a 12b-6. The factual allegations established that there were, in fact, statutory and regulatory violations. In particular, Congress has established certain rules for how this visa allocation system is supposed to work, and in particular establishes that, well, first of all, it says that waiting lists have to be maintained, shall be maintained, and second, says that on the waiting lists, these visa number allocations have to be done in a priority order. Too simple. Too simple. First you get a number, and I gather, I don't know if bakeries still have this. You walk into a crowded bakery Saturday morning, you pull a number off, it might be 72, and then you wait for the lady to call 72 and place your order. I've seen the same thing in Israeli bookstores and at the Department of Motor Vehicles. So you wait for your number to be called. But let's take Department of Motor Vehicles. If the number is called and they only have one clerk who does motorcycles and all the other clerks do cars and you're a motorcycle, when you go up to the clerk, she says, oh, sorry, you have to wait because I'm not the motorcycle clerk. And it looks like it's just like that here. Your number comes up, but you're Chinese, and they've used up the numbers for the expected monthly quota for Chinese. So you have to wait until not only do they get to your number, but they get to your number for employers who've asked for Chinese employees. Now, that's why I asked you to explain the thing simply because I may totally misunderstand the scheme. Let me see if I can try again to explain what went wrong in the process here. So, again, Congress requires that waiting lists have to be used. Actually, in the administrative record, there's an example of the waiting lists that are used. The ones in the administrative record are from July of 2010. Forgive me. I want you to answer Judge Kleinfeld's question, but so we can cabinet and you get a more clear answer, at least from my perspective. Do you have any authority that the State Department can recapture numbers from a previous year and reallocate them in a current year? Yes, I can. What's that authority? Silva versus Bell, I guess, first of all, would be first. And I think there is quite a bit more that can be said about that issue, and I'm happy to do that now. I want you to answer Judge Kleinfeld's question. So you're claiming that the Silva case gives that permission? In Silva, the court, in fact, did that. It granted equitable relief for the benefit of the class and did that because the statute does not. Again, I want to be sure we're talking about the same thing because Judge Kleinfeld's question is trying to cabinet what you do in a current year. I want to be sure that in our consideration that there's not numbers out there you can pull back. I don't read Silva the way you're talking about it, so I want to be sure I understand correctly. You're saying that Silva, as a matter of equitable principle, allowed the State Department to take a number, a visa number, from a country or whatever country and pull it back from the previous year into the current year and use that. Is that your position? Correct. Okay. Yeah, and if I can just say one more thing about that before I answer Judge Kleinfeld's statement. The reason you can do that is because, well, in Silva v. Bell, for example, the court clearly exceeded the number in that year. Fiscal year 1980 is basically what we're talking about. Silva was issued in August of 1979. We're talking about allocating visas for fiscal year 1980. The limit was 120,000. Silva said that the class of people that we're talking about can be given visas in excess of the 120,000. The reason that we can do that is because those individuals qualified, they should have been granted visa numbers in the previous years. They should have been granted visa numbers in fiscal year 1970, for example. So you're saying Silva answers the whole question in this case. There's really nothing else to talk about. Is that correct? Well, I wouldn't say there's nothing else to talk about. If you're describing it correctly, that's your case, I think. I think, yeah, our argument does depend a lot on the case. If Silva says what you say it does, you think at least the reasoning is compelling. And if we don't think you say it does, then where are you? Well, the other thing that I would say is these individuals who qualify for an immigrant visa in a given year, let's say 2008 or 2009, those individuals don't actually have to receive and use that visa number in that year. They can be, if they're entitled to it, they can receive and use that immigrant visa number in a succeeding fiscal year. And your authority for that is Silva? Well, under the statutory framework, Section 11. I don't understand why Silva helps you. And Silva, as I recall, that's a Seventh Circuit case, and the government had conceded that the visa numbers were misallocated, and more important, had restructured a program to recapture visa numbers. So there really was not an issue of whether they could be recaptured. It was just a question of the method for distributing the recaptured numbers. Here the government does not concede that any numbers can be recaptured. But if a court determines that there was a violation made and that the individuals that we're talking about were entitled under the statute to receive those immigrant visa numbers in a prior year, certainly the court, and this is what the court in Silva did, it can fix that by … What language is there in the statute that provides for recapture of numbers from a previous year? Again, the way the statute is written, the visa numbers are allocated in a given year. A person can qualify in a given year, but the person doesn't have to receive those immigrant visas in that year. He or she can receive those immigrant visa numbers in a subsequent year. There is, I think, an important point to note. When Congress wants to preclude that sort of … The thing is so complicated that I'm not at all sure I'm reading it right, but I want you to walk me through the subsection. I have the statute right here. Walk me through the subsection in 8 U.S.C. so that I can see what you mean. Okay, so I would say look at 8 U.S.C. section 1151. Okay, got it. And then subsection A1I. A1151A1I. I don't see a capital I. Yeah, it is a little bit difficult, I think, to locate that because the I looks like a Roman numeral one, but it's toward the end of section 1151. I'll have to look more later, I guess. All I see is 1151A1. I've got that. Okay. That's family-sponsored immigrants. And subsection 2? 2 is employment-based immigrants. Employment-based. So 1151A begins by saying aliens born in a foreign state or independent area who may be issued immigrant visas or otherwise given permanent resident status are limited to a number not to exceed in any fiscal year. Okay, so there's a class of individuals who may be issued immigrant visas. Yep. Okay, a class of individuals who may be issued immigrant visas. Yep. It doesn't have a floor here. It has a ceiling. It has a ceiling. That's correct. Now, those individuals, so the plaintiffs in our case, are in that category in fiscal year 2008. They do not have to receive that immigrant. They do not have to receive that immigrant visa in that year. All right. The same language that was used in Silva v. Bell there. Those individuals did not have to receive that immigrant visa in fiscal year 1970 or 1971 or whatever. They could receive that visa. What Silva v. 7th Circuit does very clearly is say you can receive that ten years later, right? So we're talking what the statute does is it creates a category of people and it does this by using the waiting lists and the priority, right? It creates a category of people who may be issued immigrant visas in a given fiscal year, in fiscal year 2008. Let me ask you a question on that. In the complaint, the plaintiffs seek, in addition to whatever they may seek about reallocation or how that may be accomplished, they seek an injunctive relief, don't they, seeking to enjoin future similar violations? Correct. Okay. The district judge held in the case that they had waived the right to. They said they're not objecting to the misallocations, and therefore it's moot, if I recall. In fact, what the plaintiffs said was that they were not objecting to the misadjudications, but they were objecting to the misallocations. That's correct, Your Honor. I think that the district court judge's determination in that regard was based on a misunderstanding of what the plaintiffs had actually said. And whether you're right or wrong about the reassignment as a result of misallocation, you still have standing, is your argument anyway, as to an injunction providing against or enjoining future violations for the class. Absolutely correct. That's what we maintain. And that's at least one of your basic arguments as to why you have standing. And you were dismissed for lack of standing, right? Yes, that's correct. All right. And the merits you may lose for some of the reasons Judge Kleinfeld has pointed out. But we're not to the merits yet. We're just to the standing. Okay. Let me just, following up on Judge Reinhart's question, would you agree that if we find that there is no authorization in statute or regulation that would permit the Department of State to, in effect, recapture a visa from a previous year and move it to a current year, that in that setting you would have no standing because there was no possible way for the Department of State to satisfy your client's concerns? No, for a couple of reasons. One is the prospective relief that we're looking for, an injunction against ongoing violations. But understand, how does that affect your client? It has to affect your clients under Lujan, does it not? Right. How does it affect your clients? Well, there are still clients who are waiting on the waiting list. But they're waiting on something from the past. That's their allegation. Are they not? No. Are they saying, we don't really care about that, we want you to do something for us in the future, or is it related to the past, that they're entitled based upon past matters? Well, there are two. I mean, I think I would argue our plaintiffs are entitled both to retrospective relief, people who are still on the waiting list, and also entitled to prospective relief. But the prospective relief is tied to the past, is it not? Well, it's – Otherwise, they go to the beginning of the end of the line, right? Well, prospective relief is tied to the present because we think – I think this goes back to the initial question from Judge Kleinfeld about what's going wrong with the regulations here. But the statutory and regulatory violations that we point out are still happening today. I did want to answer that first question. Okay. Again, I'm still struggling with the standing issue here, and I understand we're putting aside the past issue for the moment. But how – I understand your clients would like to remedy this problem for everybody, but you've got to have somebody, a named person, who has been wronged under the statute. And what particularly are you saying without reference to the past that we're talking about? If, are you in, though there's no statutory ability for the Department of State to do what your client wants, then how in do they have standing? So consider, for example, a plaintiff, June Lee, one of the five plaintiffs in this case. He has not been approved yet for permanent residence. He's still on the waiting list. The waiting lists that are – are not being used in accordance with the statute and the regulations. And he can be harmed by that because he – He can be or he has been. Well, he has been and he continues to be because the time that he waits for permanent residence then gets delayed longer and longer. But that's Congress's decision on how it's structured, isn't it? Well, ultimately, of course, but – I mean, you know, you wouldn't be the first person either on that side of the bench or this side of the bench that has scratched his or her head about why Congress did thus or so. But they set up the rules, didn't they? Okay. Let me see if I can explain what the – Let me just ask you for the answer, Judge Smith. Question. You're alleging that they're violating the rules, that they're not properly putting them on the waiting list. Correct. And that you don't want that to happen – to continue to happen. Correct. You want them to follow the procedure that – the regulatory procedure. Now, there are other questions about that, but you've got three minutes left. Okay. But your argument is that they're not following the procedure that exists under the regulations and that your client, if that continues, will be delayed from receiving the visa to which he's entitled. Right. Delayed further, even further. My critical question on that is what rule are they violating that Congress gave them? I asked you to show me before, and you showed me something related to it. But when I look at the particular rule that they're supposed to be violating, all I can find in it is Congress delegating the whole business to the State Department, make whatever rules they want. Are you really talking about a regulation that they're violating? And if you are, could you tell Judge Klinefeld how the regulation is being violated? Yes. So if we look at the waiting list that the Immigration Service and the Department of State use. Let's start by looking at the statute or the rule that they're violating. What's the regulation? Well, okay, the regulation, there are two separate regulations that are in play. The first one is 22 CFR section 42.51, 22 CFR section 42.51, subsection B. So section 42.51 establishes the regulations for controlling the allocation of immigrant visas. And basically what the regulation says is that each month the visa office will allocate immigrant visas based on chronological order, the priority dates, as reported on the waiting list from the Department of State and as reported by USCIS for people who are adjusting status. So it has to, it's under the regulation, and this is a method for controlling the use of these immigrant visa numbers. You can only allocate these immigrant visa numbers to people who are on the waiting list. From a specific country? Well, there's the waiting list. It says that in the case of applicants under INA 203C, the immigrant visa numbers shall be allocated within the limitations for each specified geographical region in the random order determined in accordance with section 42.33 and so on. Doesn't that limit how you grab those visa numbers? No, the visa numbers have to be grabbed off of the waiting list in chronological order based on what's been reported by USCIS. Okay, so you're saying that your folks don't fall within the latter part of the regulation here, so they're not limited by geographic limitation. Section 203C visa numbers shall be allocated in each specified geographical order in random order. Section 203C relates to the diversity visa program. Okay, so you're saying that second part doesn't apply here. So under your theory, if there are enough Chinese applicants with earlier numbers, then 100% of the 140,000 or so of this type of visa could go to Chinese applicants, leaving none for Mexicans or Filipinos. No, no, no, not at all, Your Honor. So let's say in each month we're allocating these visas. They have to be allocated off the wait list. There will be a number of people from all over the world and a number of people from China. These have to be allocated in chronological order until you hit the cap. So, for example, if you hit 200, and 200 is the monthly quota for China, you hit that cap, and then there are some more people from China. Those people, even though they're on the waiting list, don't get visa numbers that month, while the rest of the 3,000 are allocated to people from other parts of the world. So what goes wrong is that when the visa office establishes that waiting list and establishes a cutoff date, the Immigration Service starts grabbing those numbers for people who are not on the list. And so the visa office says, okay, look, we're going to allocate 3,000 visa numbers this month. And all of a sudden the Immigration Service grabs 10,000 numbers. And they can do that because these are numbers who are not reported onto the waiting list. That's what happened in 2008 and 2009. The Immigration Service grabbed all these numbers, violating. Who gets them? Family reunification or something? No, these are employment-based applications. So it goes to other countries? Yes. So the visa office is looking at this waiting list and says, look, okay, we've got this. We're cutting off at 3,000. But then all of a sudden the Immigration Service, because it's grabbing these numbers for people who are not on the waiting list in violation of the regulation, ends up getting 10,000 for that month. And that exceeds the quota. And then ultimately they're all gone for the year, even though they're supposed to be allocated. Okay, and that's what you've got here. But in your situation, your answer seems to be that the Department of State has the ability to manufacture, if you will, new visa numbers, pulling them from past years, forward years, something to make up for what the INS has done. Yes, we're not manufacturing new visa numbers. These are visa numbers that were available in prior years. Congress has established that these numbers are available. I understand. And I'm simply saying that I'm looking for an authorization for that. That's my problem. I haven't seen any authorization, and SILVA doesn't do it from my perspective. So we have a category of people who are under Section 1151 who can be, you know, who are entitled to get visa numbers for that fiscal year. And there are visa numbers that are available out there that are unused. Do they stay unused? I thought what happened is the State Department shorts the Chinese. Its estimates are wrong. It shorts the Chinese. So say the Chinese are shorted 10,000 visas they should have gotten. But the State Department didn't just ignore those 10,000. It gave them to Mexicans and East Indians and Filipinos. So the congressional ceiling of 140,000 has been used up. But, well, no, that's not exactly right. It's not what happens? You know, according to the report, the ombudsman report that's in the record, there are about 150,000 visa numbers that have been unused over the years. And so it's not as if we're going back and saying, okay, now there are, you know, all 140,000 were used, we're going to sort of create some new ones. That's not correct. There are visa numbers that were available that were not used that could have been allocated to the people who qualify for these immigrant visas. So they didn't get up to the 140,000? So in fiscal year 2008, I believe that they did get up to the 140,000. But the numbers that can be recaptured are from the earlier year, fiscal year 2006, for example. Those are visa numbers that were available. There were people in the class who were qualified, who could have gotten those visas in those years, but they were never allocated those visas. Now, was there some problem in reporting to the waiting list? Absolutely. Can you explain that? Yes, so I think what's going on is, you know, we've got these nice waiting lists that help the visa office control the numbers, but the Immigration Service is grabbing these visa numbers for the benefit of people who are not showing up on that waiting list. Why aren't they showing up on the waiting list? Well, because the Immigration Service, CIS, is violating, I think, two regulations, one that I've mentioned already. You know, to get on the waiting list, visa numbers can only be allocated to people on the waiting list, and they get on, CIS has to report, so 22 CFR section 42.51. Also, 8 CFR section 245.1, subsection G, which says that a person is not even eligible for adjustment of status if his name is not on the waiting list. An alien is ineligible for the benefits of adjustment of status unless the applicant has a priority date on the waiting list, which is before the cutoff date, 8 CFR section 245.1. So when the Immigration Service is using up all these numbers for the benefit of people, and this happens at local offices, I think, for the most part, the local office may be sitting on 10,000 adjustment applications that have not been reported to the waiting list. And then the Immigration Service calls up the visa office and says, look, I need a visa number for this person. The visa office says, well, what's the priority date? The priority date is fine. It's not identified by individual. And so the Immigration Service, which has 10,000 of these applications that have never been reported, pulls off all these numbers, and they disappear, and they're not done in that controlled mechanism that the statute and regulations require. Sir, help me with one question I asked you right at the beginning. We never did reach. I had thought that the way Congress conceived this was that it was for the benefit of employers. And this petition, instead of being a class action by people in China, should be a lawsuit by, oh, I don't know, Raytheon or somebody saying, hey, we need all these Chinese engineers, and you're shorting us. Aren't the employers the petitioners? Well, the employers petitioned early on in the process. There's no doubt. I thought the employers were the petitioners, and they petitioned on behalf of an individual, and they say, we can't get anyone with this person's skills in the United States, so we need this individual. And then this whole rigmarole with these three government agencies has all gone through, and finally the person gets their visa. And the idea is the U.S. government is giving that employer the right to hire a foreign national because no Americans are available who can do the job. And I don't exactly see what standing people in China would have to say, let us in, you're not giving the employers enough visas for necessary foreign engineers and such. We're talking about also people who are in the United States, people who are applying for adjustment of status. Sure, renewals. Well, renewals. A person comes into the U.S., say, as a student also, and then gets a job with a firm that needs a person with that individual skills. But it's the same thing. It's the employers who are being wronged by the U.S. government. So the employers may have standing in addition to the individual plaintiffs. Why would the individual have standing at all? Because these are individuals who are eligible. Congress gives a benefit to these individuals. They're not eligible. They can't even file a petition. The employer has to file a petition. These are individuals who have filed their applications for adjustment of status. But they can't file a petition for one of these. Oh, the I-140 petition or the labor certification. Right. Yeah, well, that's right. But once that petition is approved, the individual, not only the employer, but also the individual has a stake. I mean, Congress has given that benefit, adjustment of status, to the individuals in the United States, living in the United States. And, you know, those individuals are harmed just as well as the employer. They're harmed by not getting their – Oh, sure, it's a practical matter. They're greatly harmed. My concern is whether, reading the statute, they're in the class of persons designed to be – And certainly Silva v. Bell also dealt with that issue and recognized that the individuals have – Okay, well, we're way, way over. I apologize. And we'll still have to give you time for rebuttal. It's not your fault. We were all asking questions. Okay, thank you. We've got to understand these regulations. We think about this stuff all the time. Pretty exciting, huh? Your Honor, may it please the Court, Aaron Goldsmith on behalf of the government. Let me ask you one question to start because Judge Kleinfeld raised an interesting point. Did you argue or do you argue that they do not have standing, the plaintiffs do not have standing and only the employers do? We certainly argued that the plaintiffs lacked standing. Now, that I know. We did not argue the specific argument that he's raising in terms of the zone of interest, but since it's a jurisdictional argument, it can be considered by the Court at any time. Do you argue that? Yes, that's an additional reason why the plaintiffs lack standing. You mean this is something nobody thought of until Judge Kleinfeld came up with it? You're now in the Court of Appeals. This is the specialty of the government and nobody in the government thought of that argument? Well, there's, as we see it, a simpler reason why the plaintiffs lack standing. So you don't raise arguments about standing if you've got a better one? Well, we try to focus on the strongest or the clearest arguments with respect to the issue of whether or not a court has jurisdiction over the matter. Well, I think I'm going to take that to mean that the government elects not to pursue the question that I raised or use that argument. I'm simply saying this Court, since it's a jurisdictional argument, I defer to the Court. The Court can do as it sees fit. We can always do what we want. That's absolutely correct. That's my point. Not just on standing. On anything, yes. All right. So then why don't you give up and sit down if you defer to us on everything? Well, I would try to – if I may clarify one point, Your Honor, about what the district court actually found. If you look at the bottom of page 5 of the district court's opinion, it did not dismiss USCIS simply on the lack of standing. There was an issue that – But did the State Department, right? Yes. For USCIS, though, the issue was that there was a failure to allege that there was any particular action, any particular agency action that was in violation of the law. They could not point to any obligation that USCIS purportedly violated. And the only statute cited was 1153E, and that did not impose any obligations on USCIS. Counsel, I think you're clearly right on that. It's not USCIS's problem. I have a different problem with your case. When I went through the statistics, and I'm not sure I understood them, I'm not sure I understand the scheme, but it looked to me as though China was indeed shorted, and I couldn't figure out why China was shorted, and I just couldn't make it out. It looked like it was shorted a lot, and it looked like some other countries were over what they're supposed to get. Why? Well, under 1153G, the Department of State may make reasonable estimates as to visa demands, and they rely on those demands in establishing the visa cutoff dates. So what happened there? Estimates for China were consistently low. They didn't realize how many Chinese engineers, employers would want, or something like that? I wouldn't say they were consistently off. I would say that you had two years that were outliers, 2008 and 2009. For two years, the State Department estimates for China were generally low? Well, what the plaintiffs as— I think you and I are agreeing, except you don't like the sound of the adverb, but I can't tell for sure because you're not saying that. Well, I apologize for not being as clear as I should have been, Your Honor. What the plaintiffs told the district court, and correctly, is there was unusually high demand in those two years, 2008 and 2009. And that's a fundamental point. So you're saying there was something unusual about the number of Chinese applicants those two years? It was partially that, but also partially just the total demand for visa numbers in those two years. The Department of State looks at historical patterns for the allocation of visa numbers, and those two years were outliers. We submitted to the district court a declaration that set forward some of the reasons why that would be the case, specifically that in 2007, Congress appropriated an additional $20 million, both to the FBI and USCIS, to try to streamline the process, to hire more adjudicators and to hire more individuals from the FBI to perform background checks. There were also changes in the procedures to try to streamline the process. And it appears that the result of that was that for those two years, there was unusually high demand. And since the Department of State looks at historical patterns in making its reasonable estimates under 1153G, that's why the estimates were somewhat off. There have been actions to – and the current practice is there are now monthly meetings of USCIS and the Department of State to try to make sure that everyone's on the same page as to what is the demand. Also, the current practice is that USCIS, once it determines that an applicant is eligible, directly inputs that applicant's information into the Department of State's computer system, the IVAMS computer system, and it's stored in the IVAMS system and compared against the cutoff dates established in the visa bulletin. And once a visa number is allocated, the Department of State notifies USCIS by email and then USCIS can go ahead and approve that application. So the process is USCIS adjudicates the application, looks at the application, determines if someone is eligible, and then enters that information into the computer system, directly into the Department of State's computer system. I would also add this issue of waiting list. There's no statute anywhere that requires a waiting list for applications for adjustment status. That requirement simply doesn't appear anywhere in the code. There is a provision, 1153E3, that requires the Department of State, not USCIS, but the Department of State to maintain a list of visa applicants. But those are individuals overseas who are seeking admission to the United States, who are seeking a visa. And that provision makes sense because it is the Department of State that is responsible for adjudicating petitions for visas of individuals overseas, not USCIS. In terms of this issue of the grabbing of visa numbers, I'm not quite sure how to respond other than a visa number is not a tangible object. It's not like a visa, which is a document that someone presents to enter the country. It's a budgetary device. It's an internal budgetary device used by the Department of State to make sure that the person who is about what the scheme is. I thought, well, it's hard for me to know what other people's experience is. I don't know if bakeries still do this. Do they still give out the numbers? I believe so, Your Honor. I thought this was like that. Your employer files an application, and if it's approved, you get a number. And you might as well just stand around and play solitaire on your iPhone until they get to your number. Well, it's slightly more complicated than that. And then it's a little more complicated because it doesn't matter where they are in the numbers. If they've used up the numbers for your country, you're out of luck. Right. And it's not like the deli is or the bakery is in one location. You have people who want to use it. Well, they have a computer, so. They want to use visa numbers from all over the world. So they're trying to adjudicate visa petitions and applications of adjustment status from all over. And what they do is they group people based on the priority date. To use your analogy, it's more akin to if a bakery gave you a time stamp that said between 12 and 12-15, that if you're within that period of time, then you're up. But as you've noted, it's like there's multiple lines because there's this per country limit, this 7 percent cap established by 1152. So, I mean, that is in essence what the process is. And the other thing that's slightly different from a bakery is you're not given a number when you enter the bakery, that there's a two-step process that the employer files the petition, you get a priority date, but then you have to apply for adjustment of status. So it's not as if USCIS can simply take the application. The priority date doesn't refer to the date that the application for adjustment of status is filed. Those are two different things. Mr. Goldsmith, I want to change the subject a little bit here. Mr. Pah indicated that his clients were, of course, also seeking prospective relief. And I wonder if you could address the government's position about whether they satisfy 706-1 of the APA and also the Supreme Court's Norton v. Southern Utah Wilderness Alliance. I'm having difficulty seeing how they satisfy either of those requirements, meaning the Norton case. Would you comment on that and why you believe that they cannot make outstanding for a future prescriptive injunctive relief type of action? Yes, Your Honor. Under 706-1, a court can compel agency action unlawfully withheld or unreasonably delayed, but there are some limitations on that authority, that waiver of sovereign immunity, that Congress established when it enacted the APA. And one of those requirements is it has to be legally required. It has to be so clearly set forward that it could historically have been enforced by now. But it's not where there's a discretion on the part of the agency. The agency must be required by law to take an action in order to meet the Norton test. Is that correct? That's correct. As this Court said in Gardner, there has to be a specific legislative command. And in this case, are you aware of what the specific legislative command is as claimed by the plaintiffs? No, Your Honor. There doesn't seem to be any of those. I'll ask Mr. Powell when he comes back up to tell me what that specific legislative command is, but I'm wondering if the government knows and if it does, what its response is. No, we don't know. And that's one of the fundamental problems with this case is they've never identified a specific duty, a nondiscretionary duty. So from the government's perspective, I gather from the briefs that you believe they have no standing for the action that they speak of in connection with the past for the reasons that all of us have talked about and that based on Norton, there is no basis for a future relief claim. Is that correct? Correct. There's no basis for a future relief under 706-1. It's not enough that there is some relief that they would desire or they think makes sense. They need to identify a specific legislative command, and they failed to do so. So the whole case, from the government's perspective, is one of standing. We never really get to the merits, if you will. That's correct.  that they were required to do by statute, and, therefore, they cannot seek specific injunctive relief under 706-1. Can violation of a regulation supply the predicate, or does it have to be a violation of the statute? Our position is it has to be a violation of the statute because that's just consistent with what the APA has said and with cases interpreting the APA, such as the Gardner case, that speaks of a specific legislative command. And so, Your Honor, in this case, the fundamental problem is that plaintiffs can't identify any particular agency action that's in violation of the law. They cannot identify under 706-1 anything that either agency was required to do, and they can't identify what action they are seeking to review potentially under 706-2. And as we've discussed, there is also this issue of a lack of standing, and that has been addressed at some length, and I have nothing further to add. Do Your Honors have any additional questions for me at this time? Thank you, counsel. Thank you. You want to just start right off, give me that answer, Mr. Fahl? About the standing issue? Yeah, about what specific statute or regulation you believe mandates that, in this case, the Department of State do a particular action. Okay, we can start. It's both the statute and the regulations. We can start with the statute. Give me the statute first. Okay, Section 1153, subsection E, and then in particular subsections 1 and 3 of subsection E. The statute requires that these visa numbers be allocated in priority date order, and it also requires in subsection 3 that the Department of State use waiting lists. It says waiting lists shall be used. That's a statutory framework. I would point to one other statutory provision in Section 245, which is the adjustment of status. Hold on just a second. On 1153E, it doesn't look like it says exactly what you just described. It says in 3, which you relied on, waiting lists shall be maintained in accordance with regulations prescribed by the Secretary of State. I read that to mean congressmen saying, we don't know how to maintain these waiting lists. This is something that requires administrative expertise we don't have. Whatever State Department does is okay with us, but we're assigning it to them and not Department of Homeland Security or Department of Labor. And then if you look at the regulations, how do the regulations implement that? Let's stick with the statute for just a minute before we get to that. So I don't see where 3 helps you. Now, 1 does say that visas made available under this section shall be issued in the order in which a petition is filed, but that's not the whole scheme. And it can't possibly mean just that, because then the Filipinos and the Chinese and the East Indians and the Mexicans would absorb 100% of the 140,000. So what Congress's intention is here in enacting this provision is that, let's talk each on a monthly basis. Each month there are approximately 3,000 visas available for people in this category. And there's a limit on the Chinese application, approximately 200, let's say. So the idea is that you have to allocate those in priority date order to people from China and other parts of the world. When you hit 200 that have been allocated to people from China, well, that maxes out their category, so no more are allocated to China for that month. And then you continue to allocate on a priority basis. You use those waiting lists so that you can determine where to set those cutoff dates and which individuals are supposed to get the visa numbers. Now, before we get to the regs, the government just said, you don't get APA jurisdiction for violation of a reg, only for violation of a statute. You say you get APA jurisdiction for violation of a reg. What is the authority for that? Well, I guess what I'd say, I think the APA creates a right for people who have been harmed within the meaning of the statute. The statute, first of all, I would say I think the statute is clear here about what Congress is intending to benefit individuals on this priority date basis. It intends to benefit people who are higher up on the waiting list. To the extent that the statute is ambiguous, we can, under the APA, look to the regulations that implement that statute to see what Congress really intends. So if there's a regulatory violation, that indicates that a person has standing under the APA to object to a waiver. Well, that's assuming that there's a mandate. And if you look at 1153E subpart 3, it says, waiting lists of applicants for visas under this section shall be maintained in accordance with regulations prescribed by the Secretary of State. So what's the regulation then that has the mandatory language that you folks can enforce in an APA action? So 22 CFR section 42.51 and subsection B. I think the whole regulation is relevant. It talks about the control of allocating the immigrant visa numbers, but subsection B is particularly relevant here. It says, within the foregoing limitations, so allocating, let's say, 3,000 each month, 200 maximum to China, the Visa Office, Department of State, shall allocate visa numbers based on chronological order of the priority dates on the waiting list as, well, first of all, reported by consular officers, and second, specifically with respect to CIS, it says, and of applicants for adjustment of status as reported by officers of DHS. So it has to allocate the visa numbers. The regulation embodies this rule that the visas numbers have to be allocated to people who have been reported onto that waiting list. Now, in answer to a question from Judge Kleinfeld earlier, how did this problem come up with China? I think we can see exactly what went wrong here. So we have the waiting lists, and you have this nice list of numbers here, however many people and their priority dates in chronological order. Excuse me, just again, before we get to that on this regulation, it does say, you read the mandatory language, but it says, and it says, taking into account the requirements of INA202E in such allocations. What does that section say about this? Section 1152E. INA202E, is that 1152? That's section 1152, subsection E. All right, and what does that say? And I think that is a mechanism for reallocating numbers that's not going to be relevant in this case. It's your representation to us that INA202E is not relevant. I believe that that's correct. I don't have that on the top of my head. It hasn't been briefed in the case. If I remember correctly, that allows additional visa numbers to fall over into other categories. Like things that the INA might want, right, or INS may want? Yes. If it crowds out your folks? No, that would, in effect, make additional visa numbers available so that the number of 3,000 each month might be, and the number of 200 each month may go up. The numbers may go up. Sorry. So what went wrong with respect to the allocation numbers to China? So we have the waiting lists, and you have a nice list of 3,000, 6,000, 10,000 people each month. The visa office looks down and says, okay, we're going to cut off at this cutoff date so that we know that there are 3,000 people who get their visas. Now, there's also a waiting list of people from China, a separate waiting list, and you can go down and do the same thing. We want to allocate 200 visas to people from China. So we go down and we put the cutoff date there, and we know we have control over how many visa numbers are going to be used in the month of April, let's say. So the visa bulletin comes out and says this is where the cutoff dates are. The problem, what goes wrong, what went wrong in the China case is that the offices, and this is especially with respect to local offices, have a whole pile of adjustment applications in Las Vegas or Yakima or Portland or wherever that never showed up on the waiting list. And so when the visa office says, oh, we're going to allocate 3,000, here's our waiting list, the offices in Las Vegas or Portland or Yakima or wherever are starting to use those, and they're approving applications for adjustment of status even though the numbers were not on. And all of a sudden, 10,000 visa numbers that were ‑‑ these visa numbers were used up in April, and then all of a sudden there's nothing left, and there happened to be offices where there weren't any applicants from China there. So all of a sudden ‑‑ I didn't really understand exactly what you said, but what I understood you to be saying is that some of the local or regional offices mishandled the applications. And then the next question that comes to mind is what law did that violate? So these visa numbers are allocated, Dan, and that's a violation of the regulation here, I guess we can look at first of all. Visa numbers shall be allocated to the numbers in chronological order based on the reports to the Department of State, to the visa office. Somebody with the number 72 get their soup, and then number 32, they said no soup for you? Yeah, right, number 32 is there, and then they've already served somebody without a number, right, in Yakima. The Yakima called up, you know, we've got 5,000 applications here. They call up and they get 5,000 numbers. They would just have a centralized database where the same numbers pop up on everybody's screen. The database, though, that they're using is not on ‑‑ you don't get your name on the waiting list. What you get is you're only identified by ‑‑ If you're on the waiting list for the Alaska Airlines flight from Fairbanks to Seattle, you may get on in Yakima, or you may get on in Boise, or you may get on in Los Angeles, but they have a centralized database. Doesn't the State Department do the same thing? They don't do it that way. No, if you look at the visa list, and I'm looking at the administrative record, pages 37, 38, and so on, the administrative record, which is an example of the waiting list, it's not done by name. You only get a priority date, and so when they look down and set the priority date, if there are all these other people who have never gotten on the waiting list, have that priority date, then Yakima calls up and uses 5,000 numbers for people who never were on that waiting list, and the problem then is the visa office loses control. It lost control in our case and in a way that harmed our plaintiffs from China because it turned out that those visas were used for people from other countries, not from China. Let me ask you a question. Counsel said that this occurred because of a particular year where there were more funds appropriated. I thought I heard you say earlier that there were far more Chinese who missed this than just in that year of 2008 or whatever, 2009, that there was a larger number stemming from prior years. Yeah, in other words, there were applications of people applying from China and from other parts of the world in, let's say, 2004, 2005, 2006, who were on the waiting list. In those years, the Immigration Service didn't process enough applications, didn't use all the visa numbers, so there were a number from those earlier years. There are a number of visa numbers available that never got used, 100 according to the ombudsman, about 150,000 extra visas that never got used in those earlier years. But that wasn't the Chinese applicants particularly. That could have been across the board, right. It certainly affected some of the people in our class, but I think I suppose it affected other people from other parts of the world as well. In answer, if I can answer your question about the Southern Utah Wilderness Association case and whether the discrete action, yeah, I think that specifically this discrete action that's at issue here is the one in the regulations explaining exactly how these visas are supposed to be allocated. That's clear. It's not a regulation that says, oh, just be fair, be nice, be generous in allocating the visas. So 22 CFR 42.51B is your linchpin. Well, and in addition, I think that if you read, if you understand the statutory scheme and you read section 1153. That's kind of loaded, isn't it? Well, I guess the particular ones that I'm looking at. Give us the first half. I don't understand. 1153E1 and E3 where Congress specifically mandates this. You think that the combination of the statute and the regulation meet the requirements of the Norton case? It's certainly discrete. If you read the regulations. It is a command. The Department of State must do that. Correct. Yes. And also relevant, 8 CFR section 245.1 subsection G, the regulations that govern CIS, which says that a person is not even eligible for adjustment of status if he's not on that waiting list. So when Yakima and Portland or whatever grabbed these. I get that. I guess what I'm looking for is the linchpin here. There must be a command, a legislative command, according to Norton. And you've given me these two sections. What other section do you think is a linchpin here? What I said, section 1153. Right. And then the subsection E. Right. And the 42.51. Okay. And if we do not read those as mandates, then you lose on the forward-looking action, right? Well. Under Norton. I mean, the language says so. I mean, if you read that as. . . No, I understand that. But, I mean, I'm just asking the question. If we don't view that as a clear legislative command to do something, which they have not done and you've demanded, then you lose. I suppose that's correct. We're not looking at other regulatory or other. . . I understand. And just one final thing on this. Under Norton, is it your position that the language has to be, can be either regulatory or statutory or must it just be a statute? No, it can be either statutory or regulatory. Okay. And because Congress, I mean, the court seemed to be really focused on whether Congress had mandated something. But you're interpreting the statute to have completely delegated this to the Secretary and, therefore, in so doing, it has, the Secretary of State is carrying out Congress's express command. Yeah. It's been, I mean, the statute, we think the statute has that command there. If you read. . . That's all you need. You have to use the waiting list and you have to use in priority date order. Right. And that's the statutory command. Okay. All right. Thank you. It says, based on the chronological order of priority dates of visa applicants. You're saying it wasn't based on in any way? I'm sorry. Oh, yeah. So, right, when, in other words, so when Yakima and Portland pull off these numbers. . . Right. Because you have people who are getting these visas with a priority date that's earlier and people who have the older priority date end up not getting them because they get used before, you know, they get used, they get all used up and then they're not available for that month or for that year and the people who should have gotten them are, do not get the applications. Based on the, so, yeah, again, based on the chronological order of priority dates reported by, as reported by officers of DHS. Right. Thank you, Captain. Thank you very much, Your Honors. These issues argued will be submitted. Final case of the morning is Native Ecosystems Council v. Weldon.
judges: Reinhardt, Kleinfeld, Smith